Sands *v.* New York Life Insurance Company.

———•••———

STEPHANIE LUCY SANDS *vs.* THE NEW YORK LIFE INSURANCE COMPANY.

Where a New York life insurance company, at the commencement of the late civil war, had an agent, residing at Mobile, in the State of Alabama, to whom a person insured had been in the habit of paying the premiums, for several years; *Held* that the war did not suspend the agency, and that the payment of a premium to such agent, during the war, was binding upon the company, and had the effect to continue the policy in force.

APPEAL from a judgment entered upon the report of a referee.

On January 28, 1850, the defendants insured the life

of James Sands for $5000, in consideration of the annual premium of $160, to be paid in advance, on or before the 18th day of January, in each year. James Sands died July 12, 1862, having resided until his death at Mobile, in Alabama. This action was brought to recover the amount of the policy.

The following facts are undisputed, viz: 1. That the premiums were all duly paid to James M. Muldon, the defendants' agent at Mobile, from the commencement of the risk down to, and including the premium which fell due January 18, 1861, and were duly remitted by him to the defendants. 2. That on January 18, 1862, the said James Sands paid to said Muldon, who received the same without objection, $160 in Confederate notes, as and for the annual premium payable on that day. 3. That Sands did not die by reason of any of the risks excepted in the policy, was never in any military service, but died of disease, and that the company had waived the clause in the policy prohibiting a residence at the south during the unhealthy months. 4. That Muldon had been appointed general agent of the defendants prior to 1850, with authority, among other things, to collect premiums, which he remitted at proper times to New York, and that his authority in that behalf was not restricted by any regulations as to delivery of receipts in any particular form, or authenticated in any particular way. That by a long settled custom of the company, all transactions with holders of policies in other States were conducted by and through their local agents. 5. That the defendants did not by any act of theirs revoke Muldon's authority prior to the payment of the last premium, in January, 1862, and that on the 21st day of August, 1861, they wrote him a letter upon the affairs of the company, requesting him to perform certain duties, as their agent. 6. That under and by virtue of the act of congress of July 13, 1861, and the proclamation of the President of the United States, dated August

16, 1861, declaring the inhabitants of the rebel States, including Alabama, in a state of rebellion, a state of war existed from and after the last mentioned date, until the spring of 1865, between the United States and such rebellious States. That during the period of such rebellion, said James Sands (until his death) and said James M. Muldon; were public enemies of the United States and the citizens thereof. 7. That the plaintiff, by sufficient instruments of assignments, became owner of the policy before suit commenced, and that the proofs of death were duly made, August 18.

Upon the above facts the referee found, as matters of law :

*First.* That by reason of such state of war the said James Sands and the defendants became public enemies from and after the 16th day of August, 1861, until the death of the said James Sands, and the further execution of said contract of insurance during all that time became and was unlawful, and no right accrued to the plaintiff in consequence of the death of the said James Sands.

*Second.* That by reason of the occurring and existence of such state of war, the authority of said James M. Muldon to act for the defendants, and receive for them the premium of insurance on said policy, which became due and payable on the 18th day of January, 1862, had been and was revoked, and the payment to him at that time of such premium was not a payment to the defendants.

*Third.* That the defendants were entitled to judgment in their favor, and he ordered accordingly.

From the judgment so entered, the plaintiff appealed.

*George De Forest Lord,* for the appellant.

Three questions were discussed at the trial before the referee, and are considered in his opinion.

1. Did the existence of hostilities and the issuing of the proclamation of August 16, 1861, *ipso facto*, destroy the

original contract of insurance, or render unlawful its preservation from forfeiture by further payment of premiums.

2. Did the same circumstances, *ipso facto*, revoke Muldon's authority as agent.

3. Was the payment of Confederate money a valid payment of the premium.

The first two questions must be answered in the negative, and the last in the affirmative, to entitle the plaintiff to recover. The referee decided all these questions in the affirmative, and dismissed the complaint, with costs.

I. Controlling decisions have now settled that payment in Confederate money, under circumstances similar to those here presented, is a valid payment. (*Robinson* v. *Intern. Life Ass. So.*, 42 *N. Y.* 54. *Thorington* v. *Smith*, 8 *Wall.* 1.)

II. The existence of hostilities between the federal government and the seceded States, as recognized and shaped by the act of July 13, 1861, and the proclamation of August 16, 1861, only rendered unlawful the carrying on of commercial intercourse, and did not either affect the validity of this contract, or render unlawful the payment of the future premiums to the defendants' agent at Mobile.

1. An insurrection like that of the Southern States neither assumes the character nor entails the legal consequences of war, until the government which is assailed, by some direct act recognizes it as such, and then only to the extent of such recognition. (*Leathers* v. *Com. Ins. Co.*, 2 *Bush.* 297.) The act of July 13, 1861, and the proclamation of August 16, 1861, (*See* 12 *U. S. Stat. at Large*, *pp.* 257, 1262,) were special and limited, both in terms and effect, and did not impart to the rebellion the unqualified characteristics of war, but simply prohibited " commercial intercourse," and prescribed penalties for disobedience. The " commercial intercourse" thus forbidden was evidently some " coming" and " going" of persons and property

across the lines—something, in short, which could be licensed, supervised and controlled by the secretary of the treasury and his subordinates, like any other foreign trade. This act and proclamation, therefore, did not make unlawful anything which did not involve "commercial intercourse" (i. e. a passing to and fro) between the two sections of the country. No such intercourse occurred in this case; and, therefore, the plaintiff's rights are not impaired by anything contained in that act or proclamation. (Ward v. Smith, 7 Wall. 452.)

III. But even assuming that the act of July 13, 1861, and the proclamation of August 16, 1861, gave to the rebellion all the characteristics and consequences of an international war, they would neither avoid this policy nor impair the effect of the payment of the premium on January 18, 1862. This proposition involves an inquiry into the effects of war: 1st. Upon contracts generally. 2d. Upon this contract in particular. 1. As to the effect of war upon contracts generally. Private international law, to which these questions belong, more than any other branch of jurisprudence, is free from technicalities, and rests upon broad principles of very varied application. Its rules, as generally stated, abound not only with exceptions, to which the principles enunciated do not apply, but those rules are themselves being constantly relaxed under the influence of modern civilization, the effect being to reduce to the lowest possible point the destructive effects of war upon individual rights. Each case, therefore, should be adjudicated in a liberal spirit, and with a sincere effort to uphold whatever the necessities of war do not absolutely require to be overthrown. 2. As to the effect of war upon this contract in particular. (a.) The policy was a pre-existent contract of perfect obligation when the war broke out. As much so as a bond or note would have been which fell due by its terms, either at a certain or an uncertain period, subsequent to August, 1861. Leaving,

therefore, out of view for the present, the validity and effect of the payment of premium in January, 1862, if Sands had died prior to that date the plaintiff could have recovered. (*b.*) Although marine insurance does, life insurance does not, contravene any legitimate belligerent right. Every nation professedly seeks to accomplish and promote, by all means in its power, the destruction of its enemy's property at sea; but no civilized nation has ever sought the destruction of the lives of its enemies, except in the case of combatants in battle. Even, therefore, if life insurance could either prevent death or restore life, it would not, in the case of non-combatants, contravene any belligerent right. Every life policy would, of necessity, contain implied exceptions against death occurring, either, 1st. By the direct act of the government of the assurers— as, e. g., if Sands had been killed by a shell from the United States squadron, during the attack on Mobile—on the principle that no person shall incur liability by reason of the action of his own government, in the exercise of its legitimate powers. 2d. By reason of, or during the continuance of some known violation of law, as, e. g., if Sands had died from disease incurred while serving in the rebel army—on the principle that no illegal act can be made the foundation of a legal claim. These exceptions would be implied in accordance with familiar principles laid down in regard to marine insurance, in the following cases: *Kellner* v. *Le Mesurier*, (4 *East*, 396;) *Gamba* v. *Le Mesurier*, (*id.* 407;) *Brandon* v. *Curling*, (*id.* 410.) But no principle that has ever been laid down could carry the effect of war upon life policies beyond the limits of these exceptions. (*c.*) While marine insurance restores or replaces the thing insured, and is clearly a contract of indemnity, life insurance can never restore or replace the life insured; is not a contract of indemnity, because life can neither be valued nor compensated for, and is simply an agreement to pay a gross sum upon a contingency. The contract in

its·essence, so far as the effects of war are concerned, is undistinguishable from a bond or a note for the payment of money, and its true affinities are rather with contracts of annuity than with marine or fire insurances. "The contract commonly called 'life assurance,' when properly considered, is a mere contract to pay a certain sum of money on the death of a person, in consideration of the due payment of a certain annuity for his life, the amount of the annuity being calculated in the first instance according to the probable duration of the life; and when once fixed, it is constant and unvariable." (*Parke, B., in Dolby* v. *India and London Life Ass. Co.,* 2 *Smith's Lead. Cases, Hare & Wall. ed.* 330.) It is not essential to a contract of life insurance that it should be supported by periodical payments of premium. It may be, and sometimes is, made in consideration of a gross sum paid when the policy issues. (*Ellis on Fire and Life Insurance, p.* 185.) Had that been the plan adopted in this case, and had Sands paid a gross sum on procuring the policy, instead of agreeing to pay annual premiums, it would have been difficult to argue against this recovery. Yet it certainly cannot affect the nature of the contract, whether the consideration is paid in one sum or fifty. Ordinarily, these contracts are, in their real character, the purchase by the insurers of an annuity to be paid by the insured. The premium is the annuity; the amount insured is the price; and the nature of the contract cannot be affected by the fact that credit is given for the prices until the death of the assured. No reasons which have ever been given for declaring marine insurances void could apply to a contract of annuity. Neither can they to a life policy. (*d.*) Life insurance does not unlawfully contribute aid or comfort to the enemy. Although it secures to the assured contingent pecuniary advantages, it does not further any hostile enterprise, and numerous decisions declare that the mere accruing of pecuniary benefit to an enemy does not avoid a contract.

(*Exparte Boussmaker*, 13 *Vesey*, 71. *Buchanan* v. *Curry*, 19. *John.* 137.)

IV. The payment of premium, January 18, 1862, did not create a new obligation, or alter the character of the policy as a preëxistent contract. It was simply the performance of a condition requisite to prevent a forfeiture. A life policy is not a succession of contracts from year to year, but a single indivisible contract, extending from the date of its issue till the death of the assured. If each annual payment inaugurated a new contract, then the insurers might, at pleasure, decline to accept it, or fix a higher rate, or impose more onerous terms. But such is not the case. The assurers must accept the premium if tendered, and upon payment thereof the terms of the original contract continue as before. All that the assurers reserve is a chance of forfeiture, if the premium should not be paid, like the chance reserved by a mortgagee to call in the principal upon thirty days' default in payment of interest. These conditions of forfeiture do not break the continuity of either contract, or convert it from one into several contracts.

V. The referee has erred upon principle, in holding that war renders illegal the further performance of preexistent contracts, in the same manner that it renders illegal the making of new contracts. 1. The distinction between the acquisition of rights under new contracts, and the preservation of those rights under old ones, is too well established to be questioned. And it may be doubted whether even the making of a new contract would be unlawful, provided it involved no intercourse across the lines, contravened no belligerent right, and did not, in the technical sense, lend aid or comfort to the enemy. But however this might be in relation to a new contract, it is established that performance may be completed upon preexistent contracts, provided it infringes none of these three rules. (*Buchanan* v. *Curry*, 19 *John.* 137.) The payment

in question did not infringe any of them. 2. The referee erred in considering this policy as an executory contract. It was partly executed and partly executory, and such contracts are never treated in law as executory contracts. Why should the one premium which remained to be paid when the war broke out prevail to give it an executory character over the eleven premiums which had then been paid, to give it an executed character. 3. The referee was led astray by mere dicta, contained in two cases of inferior authority. (*Leathers* v. *Com. Ins. Co.*, 2 *Bush.* 297. *Mitchell* v. *Merc. Life Ins. Co., not reported.*)

VI. The breaking out of the war did not revoke Muldon's agency. The defendants did not revoke it until May, 1862; and they recognized it as continuing to exist after the proclamation of August 16, 1862. 1. Their letter to him, dated August 21, 1861, recognized and provided for the continuance of his agency. 2. Their circular letter of May, 1862, four months after this premium was paid, is the first pretense of an attempt to revoke that agency. 3 Whatever war may do as to other civil relations between citizens of contending States, it does not destroy that of principal and agent. The right to have an agent in the enemy's country is distinctly recognized, even in cases which declare other relations to be broken up. (*Griswold* v. *Waddington*, 16 *John.* 438. *Buchanan* v. *Curry*, 19 *id.* 137. *Denniston* v. *Embrie*, 3 *Wash. C. C.* 396. *Conn.* v. *Penn*, 1 *Peters, C. C.* 496. *Ward* v. *Smith*, 7 *Wallace*, 452. *U. S.* v. *Grossmayer*, 8 *id.* 75. *Robinson* v. *Inter. Life Ass. Soc.*, 42 *N. Y.* 62.) *Griswold* v. *Waddington* contains the most exhaustive examination of the effects of war upon the mutual relations of enemies that can be found, and that case was decided upon two points only, viz : (*a.*) That inasmuch as all intercourse or communication with an enemy was unlawful—no matter how circuitous a course through neutrals it might take—the court would not sustain a contract based upon remittances

during the war. (*b.*) That inasmuch as mutual inter-course and co-operation and effort, which are presumably essential objects in the formation of copartnerships, be-come unlawful in war, therefore war determines such co-partnerships, not because the relation is unlawful, but because the accomplishment of their essential purpose is thenceforth rendered impossible. Neither of these grounds would apply to the case of an agency, since its object is to dispense with, instead of to promote, intercourse be-tween the enemy principal and those dealing with him; and since the object of the relation, instead of being de-feated, becomes more than ever necessary, by reason of the interdiction of direct intercourse with the principal. 4. Before it can be held that war, *ipso facto*, destroys an agency, the decisions and dicta of the following cases must be distinctly overruled: (*Buchanan* v. *Curry*, 19 *John.* 137. *Denniston* v. *Imbrie*, 3 *Wash. C. C.* 396. *Conn.* v. *Penn*, 1 *Peters C. C.* 496.) See also *Ward* v. *Smith*, (7 *Wallace*, 452, 453;) *U. S.* v. *Gossmayer*, (8 *id.* 75;) *Robin-son* v. *Inter. Life Ass. Soc.*, (42 *N. Y.* 62.) In the latter case, it is said, "it is far from certain that, if the resi-dence of the defendant had been in the city of New York, the existence of war would have vacated or suspended the authority of Carvardin. A power of attorney to collect a debt, or to receive money, (in that case, insurance premi-ums,) seems to continue valid, although the principal re-sides in an enemy's country." If money may be paid to an agent during war, to prevent the accruing of interest, why not, also, to prevent the forfeiture of a mortgage debt, or of an insurance policy? If an agent may retain his powers for one of those purposes, why not for the other?

*Henry E. Knox*, for the respondents.

I. From the time that, by virtue of the act of congress and proclamation of the President of the United States

above mentioned, a state of war existed between the United States and the rebellious States, James Sands and the defendants became, and were, for all legal intents and purposes, public enemies, and all commercial or pacific intercourse or dealing between them became unlawful. The domicil of the assured, in the territory of the Confederate States, made him, in the eye of the law, an enemy of all the people in the adhering States. This principle is well founded and elementary, and has been repeatedly laid down in adjudicated cases. See the case of *The Rapid*, (8 *Cranch*, 155;) *Wheat. Law of Nations*, *p.* 548; *Mrs. Alexander's Cotton*, (2 *Wal.* 419.) See also 1 *Gallison's Rep.* 295, where Judge Story declared that, "war put every individual of the respective governments, as well as the governments themselves, in a state of hostility with each other; that the subjects were in all respects considered as enemies." These general doctrines have been declared by the Supreme Court of the United States to be applicable to the recent civil war, and in pursuance of said application of them the courts have held all intercourse and all transactions between the citizens of the United States and the citizens of the so called Confederate States, since the date of the President's proclamation, illegal and void. (*See prize cases*, 2 *Black*, 673.) The Court of Appeals of Virginia, in the case of *Billgery* v. *Branch*, (8 *Am. Law Reg.* 334,) says: "These decisions of the supreme court settle beyond question that the late conflict between the United States and the Confederate States was a war in the legal sense, with all the incidents and consequences of a war, as they are known to the international law; that accordingly all the citizens on the one side were enemies of all citizens on the other; that all commercial and other pacific intercourse or communication between them, unless specially authorized, was unlawful, to the same extent, and for the same reason, as a war *inter gentes;* and that in order to determine how the

contracts of individual citizens were affected by the said war, recourse must be had to the general principles applicable to a state of war as they are found in the international code." It is unnecessary to multiply citations to support a proposition so abundantly supported by the highest authority. It is only necessary to know where the residence of a person may be, to decide the question whether or not he is to be deemed an enemy in time of war. If such residence be in the territory of the hostile power, that person becomes a public enemy with whom all intercourse, commercial or otherwise, is unlawful. For further authorities, see *In re William Bageley*, (5 *Wallace*, 377;) *Hanger* v. *Abbott*, (6 *id.* 535;) *Robinson* v. *National Ins. Co.*, (42 *N. Y.* 54;) *Swinnerton* v. *The Columbian Ins. Co.*, (37 *id.* 178.)

II. In consequence of such state of war, any insurance on the life or property of the enemy became not only illegal and void, but repugnant to every principle of public policy. After the date of the President's proclamation the assured became a public enemy upon whose life it was unlawful to make or to continue insurance. (*See* 1 *Duer on Ins.*, 473; 1 *Phil. on Ins.*, § 223; *Furtado* v. *Rodgers*, 3 *Bos. & Pul.* 191; *Gamba* v. *Le Mesurier*, 4 *East*, 407; *Brandon* v. *Curling*, *id.* 410; *Odelin* v. *The Penn. Ins. Co.*, 2 *Wash. C. C.* 321; *Gray* v. *Lewis*, 3 *id.* 280.) In *Griswold* v. *Waddington*, (15 *John.* 57,) and same case in the court of errors, (16 *id.* 438,) it is held "that as soon as war is commenced all trading, negotiation, communication or intercourse between the citizens of this country and the enemy, without the direct permission of the government, is unlawful. That if after the war has ceased an action is brought against a citizen here upon any contract arising out of such illicit intercourse, the defendant may set up the illegality of the transaction as a defense." The Kentucky court of appeals have decided to the same effect in a case growing out of a policy of insurance annulled by

the rebellion. (*See Leathers* v. *The Com. Ins. Co.*, 2 *Bush*, 298.) In the cases already cited from 5 *Wallace*, 377, and 6 *id.* 535, it is declared that executory contracts with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, are *ipso facto* dissolved by the declaration of war, which operates to that end and for that purpose with a force equivalent to that of an act of congress. It being clear from such an overwhelming weight of authorities that the insurance of an enemy's property is illegal, it is submitted that the same principle is *a fortiori* applicable to cases of life insurance. It is admitted in the argument for the plaintiff that such an insurance could not be legally effected during the war. It is submitted that this concession yields the whole ground. The acceptance of a renewal premium is practically a new insurance, and makes virtually a new contract. The obligation of the insurer ceases with the period for which the premium is paid, and it is by the payment of a new premium only that a new insurable term is created. In the language of the Kentucky court of appeals, " it is a contract of continuing performance, one executory in its nature and requiring an act of commercial intercourse with a public enemy illegal and contrary to every principle of public policy." As a matter of principle there can be no distinction between fire and marine risks for the benefit of an enemy, and risks upon his life, so far as the question under consideration is concerned. It is difficult to imagine any manner in which more effective aid, comfort and strength could be rendered to an enemy than by maintaining in full force and effect, policies upon the lives of its citizens. It is admitted that the adjudicated cases in which the principles heretofore referred to have been applied to life insurance are but few in number, which is easily accounted for by the fact that life insurance is a matter of comparatively recent origin and developement, and that our own

civil war furnished, perhaps for the first time, a class of cases in which the application could be made; but it is undeniable that all the arguments above cited in reference to fire and marine insurance are applicable here, if possible with even greater strength.   There is, however, sufficient direct authority on the point in question, to render unnecessary any extended discussion of it.   *Bunyan on Life Insurance,* (*pages* 19 *and* 308,) says: "The life of an alien enemy cannot, however, be insured even for the benefit of a creditor or British subject."   (*Flindt* v. *Waters,* 15 *East,* 260.   *Harman* v *Kingston,* 3 *Camp.* 153.   *Potts* v. *Bell,* 8 *T. R.* 548.)

III. The war operated, therefore, *per se,* as a revocation of the authority to the defendants' agent in Mobile, and without any act of the parties themselves, dissolved the relation previously existing between. him and the defendants, and consequently his receipt of Confederate currency as the premium, or any act of his in reference thereto, was not available to, in any manner, bind or affect the defendants.   Mr. Muldou, the agent through whom the insurance was effected, continued to reside in Mobile, within the lines of the Confederate States, during the whole continuance of the war, and therefore became, as well as did the assured, an enemy of the defendants, after the war had commenced.   The case is analogous to that of a commercial partnership, where the partners are citizens of different countries which have become engaged in war.   The doctrine is conclusively settled, that the war absolutely dissolves such partnership, without any act of the partners, and whether they so desire or not.   In the case of *Hanger* v. *Abbot,* (6 *Wallace,* 535,) the Supreme Court of the United States say: "Partnership with a foreigner is dissolved by the same event which makes him an alien enemy, because there is in that case an utter incompatibility created by the operation of law between the partners, as to their respective rights, duties and obligations,

both public and private, which necessarily dissolves the relation, independent of the will or acts of the parties." (*Story on Part.* § 313.   5 *Wallace,* 406.   2 *Brush.* 298.)

It is a well settled doctrine in England, that a British subject or company cannot insure the life of an alien enemy, even though the latter be his debtor.   (*Bunyan on Life Ins.* 19, *Law Lib. vol.* 49.)   It is as clear as any legal principle can possibly be, from the above considerations and decisions, that at no time during the war could the New York Life Insurance Company have insured the life of an enemy, that is, any resident whatever of the rebellious States.   How then could it do by an agent what it could not do in and of itself?   *Qui facit per alium, facit per se.*   The payment by our enemy to our enemy, in the enemy's country, of a premium which gives a new term to an insurance on a life of an enemy, is a transaction that cannot be sustained even in the remotest degree by any adjudication that can be found in the reports.   The payment of each annual premium creates a new contract, and thereby continues the insurance.   It is clear that no right was, or could have been, acquired as against the New York Life Insurance Company, by reason of any receipt of premium on the part of Mr. Muldon, after the breaking out of the rebellion.   His authority as agent was at that time wholly at an end, and any attempt on his part to act under it was entirely nugatory and futile.

IV.  By the terms of the policy in question, the payment on the 18th day of January of every year during its existence, by the assured to the defendants, of the annual premium of $160, is a condition precedent to any obligation on the part of the defendants.   The contract of insurance does not go into effect, in the first instance, until the payment of the first premium, and is continued in force only in consideration of the regular payment of such premium according to the terms specified.   If, for any reason, such premiums are not paid on the day specified, the policy, by

its terms, is to "cease and become null and void." Whatever cause the assured may allege as a reason for the nonpayment of the premium at the specified date, he still is not excused, according to the general principle, that a person who has contracted to do a particular thing, is not excused from its performance by accident, or even by "unavoidable necessity, because he might have provided against the necessity, by his contract." (*Oakley* v. *Morton,* 11 *N. Y.* 25. *Catlin* v. *Tobias,* 26 *id.* 217. *Harmony* v. *Bingham,* 12 *id.* 99. *Tompkins* v. *Dudley,* 25 *id.* 272.) A condition precedent (which is one that must take place before an estate can vest) must be strictly performed, to entitle a party to recover, and will be strictly construed. (*Holdipp* v. *Otway,* 2 *Saund.* 106. *Wood* v. *Nasby,* 6 *T. R.* 710. *Oldman* v. *Bewick,* 2 *H 'Black.* 577, *n. Routledge* v. *Burrell, Id.* 254. *See also French* v. *Campbell, Id.* 161.) In repeated decisions the payment of the premium provided for by a policy has been held to be one of those conditions precedent which must be strictly performed, and that as regards a failure in respect to it, the courts will not, and can not, interfere. In *Phillips* v. *Eastwood,* (*Lloyd & Gould,* 291,) Lord Chancellor Sugden said: "The money stipulated by the policy is not to be paid unless a certain person die, and unless certain annual payments are made, and other conditions are complied with." This rule is laid down in the following cases: *Mutual Benefit Life Insurance Company* v. *Ruse,* (1 *Bigelow,* 83 ;) *Howell* v. *The Knickerbocker Life Ins. Co.* (3 *Rob.* 232 ;) *Robert* v. *The New England Mu. Life Ins. Co.* (1 *Bigelow,* 634.) In *Howell* v. *The Knickerbocker Life Ins. Co.* (*supra,*) the superior court of New York says: "It is therefore clear that the payment of the premium, on or before the 15th of July, was a condition precedent to the renewal or continuing of the policy, and before a recovery can be had on this policy, the parties seeking such relief are bound to prove all the conditions contained therein, and especially the condition

requiring the payment of the premium on the 15th day of July, the day on which it became due, or at least the payment of the same before the death of Mr. Howell." (*See also Catoir* v. *The Am. Life Ins. & Trust Co.,* 4 *Vroom.* 487.) A careful examination of the authorities discloses the fact that the present suit is one of the first class of cases (i. e. suits upon policies of life insurance upon the lives of residents of the rebel States, dying during the rebellion,) in which it has been attempted to maintain the validity of a policy of life insurance where the premium was not paid when due. In this class of cases, which we are considering, there was no actual impossibility on the part of the insured to make payment of the premiums in question. By coming, and remaining, within the lines of the adhering States, payments might have been made promptly and regularly. It was not the fault of the defendants that the assured chose to remain within the insurgent lines, nor should they be held responsible on account of that fact. But, apart from these considerations, it is submitted that it has been abundantly shown that even if the payment had been actually impossible the assured would not be excused for having failed to make it. He had absolutely contracted to do so, and as above shown, a person who has contracted to do a particular thing is not excused from its performance by even the most unavoidable necessity.

V. The payment of confederate notes in Mobile, by the assured, to the agent of the defendants, was not a payment of the premium due by the assured to the defendants on the 18th day of January, 1862, and did not continue the policy in force. The confederate money was worthless as payment. It was not a legal tender, even by the laws of the Confederate States. Even if his agency had not been terminated by the breaking out of the war, Mr. Muldon was not authorized to receive in payment of premiums anything else than money, so as to bind the de-

fendants without their ratification, which in this case is not pretended. An agent's authority, however generally expressed, is never to be extended by construction to embrace acts prohibited by law. (*Clark* v. *Metropolitan Bank,* 3 *Duer,* 241.) To receive confederate currency as money, or to have any dealings or transactions in it, was illegal at the time. The general rule is well settled, that a third party, even if he has dealt with an agent in good faith, must suffer the loss, rather than the principal, where the agent has not acted within the general scope of his employment. The terms and conditions of the policy of life insurance in question expressly provided that the premium should be paid to the agent in money; that is, in coin, or some legal tender of the United States. The conditions of the policy in this regard formed a contract between the assured and the defendants. It was admitted by the plaintiff's counsel, on the argument below, that Muldon's authority only went to the receipt of money. It seems unnecessary to argue at length that he had no right to accept in lieu of money a currency which not only was of no value, but was a consideration illegal in itself, and could not possibly form a valid foundation, either for creating a new contract or continuing an old one.

GEO. G. BARNARD, J. The decision of the referee was wrong. I do not think the civil war suspended the agency. The plaintiff's husband had for years paid the premium to the defendant's agent. After the war commenced, viz., in 1862, the plaintiff's husband paid to the defendants' agent the premium. The reason why he did not pay it to the defendants themselves was because he was in the Southern States, and could not get north to pay it to them. This court has held that the agency was not suspended by the war. It would be the height of injustice to hold that the plaintiff's husband having paid, regularly, the premium from 1850 to 1862, was, by no act

of his, to be deprived of the benefit of the policy. It should not be the policy of the law to increase the defenses of life insurance companies as against persons honestly insuring with them.

The judgment should be reversed; a new trial ordered; and the reference vacated.

CARDOZO, J., concurred in ordering a new trial.

New trial granted.

[FIRST DEPARTMENT, GENERAL TERM, at New York, June 6, 1871. *Cardozo* and *Geo. G. Barnard,* Justices.]